UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID HENRY AND HEATHER
WILLIAMS,

                               Case No. 17-cv-11061

                 Plaintiffs,

                               Paul D. Borman
v.                               United States District Judge

THE CITY OF FLINT, MICHAEL    David R. Grand
HENIGE, SEAN COE, AND NIKOLAS  United States Magistrate Judge
WHITE,

                    Defendants.
_____/

## ORDER AND OPINION GRANTING DEFENDANTS MICHAEL HENIGE, SEAN COE, AND NIKOLAS WHITE'S MOTION FOR SUMMARY JUDGMENT (ECF #88)

## I.    BACKGROUND

Plaintiffs David Henry and Heather Williams (collectively, "Plaintiffs") are residents of the City of Flint, Michigan. On the night of November 23, 2016, Henry was arrested by Defendant City of Flint Police Officers Sean Coe, Michael Henige, and Nikolas White ("Officers") and charged with "Disorderly Conduct and Disorderly Persons" in violation of Flint Ordinance Section 31-12 and "Resisting Arrest" pursuant to Section 31-1.[1]

_____

[1] Although Henry's citation lists Mich. Comp. Laws § 750.167 as the "Disorderly" violation, this was essentially a scrivener's error due to computer field auto-

1

Plaintiffs filed the instant lawsuit asserting the following federal civil rights violations:

Count I:     Violation of Civil Rights under 42 USC §1983 (Fourth Amendment – Unlawful Arrest) Against the Individual Defendants

Count II:    Violation of Civil Rights under 42 USC §1983 (Fourth Amendment – Excessive Force) Against the Individual Defendants

Count III:   Violation of Civil Rights under 42 USC §1983 (First Amendment – Retaliatory Arrest) Against the Individual Defendants

Count IV:    Violation of Civil Rights under 42 USC §1983 (Municipal Liability) Against the City of Flint[2]

Before the Court is the Officers' Motion for Summary Judgment. (ECF #88.) On December 20, 2018, the Officers filed the instant Motion. On January 25, 2019, Plaintiffs filed their Response (ECF #104). On January 31, 2019, the Officers filed their Reply. (ECF #105.) The Court held a hearing on May 3, 2019.

---

population. (Dep. of Dr. Donald McLellan, Nov. 19, 2018, ECF #99-2.) The Flint City Attorney amended the charge to the proper ordinance violations, as alleged in Plaintiff's' First Amended Complaint: "Officer Henige charged Mr. Henry with disorderly conduct (City of Flint Code Ordinances § 31-12) and resisting arrest (City of Flint Code Ordinances § 31-1)." (1st Am. Compl., ECF #30, ¶51, PgID 406.)

[2] The City of Flint was dismissed from this matter by stipulation of the Parties on January 15, 2019. (ECF #98.)

## II.    FACTS

At or around one a.m. on the night of November 23, 2016, while on patrol, Officers Coe and Henige stopped to question a woman who provided information regarding the location of an individual with an outstanding felony warrant. (Dep. of Michael Henige, Mar. 6, 2018, ECF #88-1, 65:5-70:5, PgID 1612-17.) She stated that the individual was possibly located at 1706 Colorado Avenue. (*Id.*) The Officers then placed her in the rear seat of the patrol car and proceeded to that address in search of the warrant suspect. (*Id.*)

Plaintiffs' home was located directly next to 1706 Colorado Avenue, at 1714 Colorado Avenue. (Dep. of Sean Coe, Mar. 7, 2018, ECF #88-3, 111:3, PgID1831.) Upon arrival, Officers Coe and Henige stepped out of their patrol car to investigate 1706 Colorado Avenue using flashlights. Plaintiff Henry, who, at the time was awake and in his living room with his girlfriend, Plaintiff Heather Williams, noticed the lights shining into the windows of his home. (Dep. of David Henry, Oct. 10, 2017, ECF #88-8, 61:9-12, PgID 1978.) This prompted Henry to begin recording with his mobile phone (which he does "everywhere I go"), and Henry and Williams went outside to investigate. (*Id.* at 61:17-23, 67:3-11.) Henry had installed multiple outdoor security cameras and monitor banks that surveil the perimeter of his home. (*Id.* at 55:4-24; 59:12-22.) Henry testified that he purposely did not set the front camera to record when he went outside that night because he was recording with his

mobile phone. (*Id.*) Williams testified that she immediately understood that the lights had come from the Officers because she saw marked law enforcement vehicles when she and Henry stepped out on their porch. (Dep. of Heather Williams, Oct. 10, 2017, ECF #88-15, 40:13-15, 42:3-10, PgID 2449, 2451.) Henry testified that upon going outside, he asked what was going on, and one of the Officers informed him that they were the police. (Henry Dep., Oct. 10, 2017, ECF #88-8, 63:23-24, PgID 1980.) At that point, this "conversation" between Henry and Officers Henige and Coe commenced:

> Henry: I don't know why they all flashing up in my yard and stuff… Why you all up in the yard and stuff.
>
> Officer Henige: What's up?
>
> Henry: Why you all up in my yard flashing the lights everywhere?
>
> Officer Henige: This is not your yard. This - Do you own this house?
>
> Henry: Somebody was just on the side over there.
>
> Officer Henige: That's the back yard of that house.
>
> Henry: Okay, but I just – I – I seen lights on – I seen lights on the side of my house.
>
> Officer Henige: Well, it's a light.
>
> Unknown Officer: What's going on?
>
> Officer Henige: He told me we were on his property. I said do you own that house? No, no he doesn't.

(Defs.' Mot., ECF #88-7, Cell Video at 0:19-1:05.)

At this point, the exchange's tone and volume began to escalate:

>Henry: You ain't gotta be an asshole. I just asked a question.

>Officer Henige: You asked it like an asshole, man.

>Henry: I ain't acting like an asshole. I asked what you was doing on the side of my house.

>Officer Henige: Is that any of your business right now?

>Henry: Yeah, it is my business.

>Officer Henige: Tell me how?

>Henry: But it is my business.

(Defs.' Mot., ECF #88-7, Cell Video at 1:05-1:20).

The debate continues as to whether the Officers' activity was Henry's "business," and Henry's volume remained elevated. At this point, Officer Coe made a comment to Officer Henige, with the apparent intent that Henry hear it, that, "I think we just got a new project house."[3] (Defs.' Mot., ECF #88-7, Cell Video at 1:05-1:20). The "project house" comment prompted Henry to "threaten" the Officers that they would "find out who I am downtown." (*Id.*)

---

[3] "Project house" is a term for a residence where the police believe there may be some type of problematic "issue." (White Dep., ECF #88-9, PgID 2260, 81:18-21.)

Officer White then unsuccessfully attempted to de-escalate the situation, while Officer Coe interjected requests that Henry approach the police vehicle to speak with the Officers:[4]

> Henry: You got a new project house? Really. Don't come on my property.
>
> Officer White: I'm just asking you a question.
>
> Henry: What?
>
> Officer White: So, I understand your concerns, bro.
>
> Henry: No – No, I just asked him a simple question on why, why is lights on the side of my house, and you want to be an asshole.
>
> Officer White: Okay, I'm not being an asshole.
>
> Henry: I know you're not, but both of them, talking about he gonna make my house a new project, you gonna run up and find out who I am downtown and stuff - make my house a project.
>
> Officer Coe: Why don't you just come over here, and we'll talk about it.
>
> Henry: You know something, I got freedom of speech. I can walk anywhere I want to. I haven't committed no crime. You the one being out of control.
>
> Officer White: Hey, hey.
>
> Officer Coe: Come over here and we'll talk.
>
> Henry: What's that?

---

[4] The Parties differ on Coe's motivation for asking Henry to step closer to the vehicle, but ultimately Henry remained on his property.

6

Officer White: Can we just explain to you…

Henry: Mm-Hmm..

Officer White: We're trying to explain to you what - what the issue was, okay?

Henry: Okay.

Officer White: You're in an area where there's quite a few abandoned houses.

Henry: Okay.

Officer White: And it's kind of annoying, when like, people are breaking in…

Henry: Well like I said, I seen lights on the side of my house so I came out to see – this asshole wanna talk shit.

Officer White: Hold on, hold on. Listen – Listen, the issue wasn't – wasn't that we were shining our light…

Henry: He ain't have to be rude, though. He was being rude. F- Flat out, point blank, he was being rude. And that's unbecoming of him of being an officer; he's a plain-out rude person.

Officer White: So I'm not going to be able to explain anything to you tonight, sir… Huh?

Henry: You know something you can get in your vehicle cuz I can see you trying to be a asshole too, sarcastically.

Officer Coe: You think he's an asshole because he's an officer?

Henry: You are.

Officer Coe: Then come here man, we'll talk man-to-man.

Henry: You come over here.

Officer Coe: Do I have permission to come on your property?

Henry: No you fucking don't so get the fuck on!

Officer Coe: I can stay right here all night.

Henry: Stay. Dumbass.

Officer Coe: Sounds good.

Henry: Motherfucker. You ain't gonna…what you gonna do to me. I ain't committed no crime. Cite a crime I committed. Cite a crime I committed. Cite a crime I committed.

Officer Coe: C'mon on.

Henry: What crime have I committed… You come on. You the one threatening me.

(Defs.' Mot., ECF #88-7, Cell Video at 1:21-3:43).

Officer Coe testified that he saw a light turn on at a neighbor's home and told Henry, "I'm just worried about you bothering the neighbors," (Dep. of Sean Coe, Mar. 7, 2018, ECF #88-3, 122:16, PgID 1842; Defs.' Mot., ECF #88-7, Cell Video at 3:50-52), to which Henry loudly replied, "Fuck you. Ain't – man – Ain't no – nobody bothering nobody… Y'all are the ones bothering people you punk motherfuckers." (Defs.' Mot., ECF #88-7, Cell Video at 3:50-52.) The line of statements involving the "threat" then resumed:

Officer Coe: Okay… You done?

Henry: Are you done?

Officer Coe: I'm done.

Henry: Well get the fuck on then, bitch. Fuck you…. and your damn job motherfucker.

Officer Coe: Okay.

Henry: What you – Make my house a project. I want you – You want to make my house a special project? Bring it on.

Officer Coe: Okay.

Henry: Bring it on.

Officer Coe: Okay.

Henry: Then you gonna find out who I am.

Officer Coe: Okay, is that a threat?

Henry: Yeah! That's a – that's a promise it's a threat! That's a promise that it's a threat because I ain't did no crime… I haven't committed no crime.

(Defs.' Mot., ECF #88-7, Cell Video at 3:52-4:35).

At this point, Henry had been walking towards his house from the sidewalk while still yelling at the Officers. Following Henry's statement, "…that's a promise it's a threat," Office Coe exited his vehicle and commenced to approach and arrest Henry at his front door. (ECF #88-11, Dash Video, Camera 1, at 01:04:49; Coe Dep., ECF #88-3, 55:19-56:10; 170:9-19.) Officer Coe grabbed Henry by his shirt, who pulled away causing the shirt to tear off. (Coe Dep., ECF #88-3, 55:14-18, PgID 1775.) Henry had made it to the doorway where he and Officer Coe continued to struggle, Henry grasping at the doorframe. (Henige Dep., ECF #88-2, 44:16-20,

PgID 1519.) Officer White arrived on the porch to assist Officer Coe, and grabbed Henry around the torso from behind as he "flailed around," at which point Officer Coe issued a single shot of Oleoresin Capsicum spray ("OC-spray") to Henry's face. (White Dep., ECF #88-9, 57:5-58:24, PgID 2231-32; Coe Dep., ECF #88-3, 168:21-169:6, PgID 1888-89; Defs.' Mot., ECF #88-7, Dash Video, Camera 1 at 4:47-4:50).) During the struggle in the doorway, Officer White testified that:

> [Heather Williams] was close [to Henry]. She was pulling at us and, you know, pushing a little bit too…I wouldn't say she was actively fighting, not in the same sense [Henry] was…I think I got a little bit of the [OC-spray]. I think – I think everybody did.

(White Dep., ECF #88-9, 109:5-15, PgID 2283.)

Once Officer Coe administered the OC-spray, Officer White testified that Henry "head-butted" him, and "it took all three of us to get him pried off that door." (White Dep., ECF #88-9, 101:12-16, PgID 2275.) Officer White lifted Henry off the porch and "assisted" him to the ground. (Henige Dep., ECF #88-2, 59:23-60:6; 171:13.) Officer Henige placed Henry's hands behind his back and handcuffed him. (Henige Dep., ECF #88-2, 113:18-20, PgID 1660.) Henry was no longer resisting and suffered a scraped knee. (Henry Dep., Oct. 8, 2017, ECF #88-8, 108:4, PgID 2025.) Henry was informed that he was arrested for threatening an officer, but was later charged with "Disorderly Conduct and Disorderly Persons" in violation of Flint Ordinance Section 31-12 and "Resisting Arrest" under Section 31-1. (White

Dep., ECF #88-9, 104:3-14, PgID 2278; Henige Dep., ECF #88-2, 115:2-3, PgID 1661.)

Henry was then transported by Officer White, the only officer in the vehicle, approximately 2.8 miles to the City of Flint Jail. (Henry Dep., Aug. 13, 2018, ECF #88-8, 194:2, PgID 2132.) Henry was spitting, wheezing at a high pitch, and rocking back and forth in the back seat of the police vehicle during the entirety of the ride, at one point thrashing in seizure-like motions. (Defs.' Mot., ECF #88-11, Dash Video, Camera 2, 1:12:53-1:19:15.) Henry claims that he was not provided with adequate medical care for a seizure he suffered during his transport to the Flint City Jail. (*Id.* at 1:16:39-1:17:19). At his deposition, Henry testified that he was unaware that he had any seizure-like activity until viewing the Dash Video footage. (1st Am. Compl., ECF #30, ¶62; Henry Dep., Aug. 13, 2013, ECF #88-8, 136:24-137:16.) Officer White also testified that he was unaware of any seizure until he saw the footage, nor did he hear any complaints regarding Henry's handcuffing until after arriving at the station, when the cuffs were removed. (White Dep., ECF #88-9, PgID 2237-36, 63:6-64:12, 19-25.)

## III.   STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a

summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co*., 751 F.2d 171, 174 (6th Cir. 1984)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 247 (6th Cir. 1991) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323). If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322. "[A] complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323.

"The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586–587 (1986) (footnote and internal quotations omitted).

In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). "'The central issue is whether the evidence presents a sufficient disagreement

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc*., 398 F.3d 555, 558 (6th Cir. 2005)). At the same time, plaintiff must produce enough evidence to allow a reasonable jury to find in his favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp*., 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

Ultimately, the party who bears the burden of proof must present a jury question as to each element of the claim. *See Davis*, 226 F.3d at 511. Plaintiff cannot meet that burden by relying solely on "[c]onclusory assertions, supported only by [his or her] own opinions." *Arendale v. City of Memphis*, 519 F.3d 587, 560 (6th Cir. 2008). Plaintiff must show probative evidence, based "on more than mere speculation, conjecture, or fantasy," to prevail. *Id*. at 601 (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir.2004)).

All evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial:

> The submissions by a party opposing a motion for summary judgment
> need not themselves be in a form that is admissible at trial. Otherwise,

affidavits themselves, albeit made on personal knowledge of the affiant, may not suffice, since they are out-of-court statements and might not be admissible at trial. *See* Fed. R. Evid. 801(c), 802. However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir.1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" *Ibid.* It is also the basis of this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e).

*CareSource*, 576 F.3d at 558-59 (internal citations omitted).

A court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

## IV.  ANALYSIS

Plaintiffs argue that the Officers are not entitled to qualified immunity on their claims of wrongful arrest, excessive force, and First Amendment retaliation. Plaintiffs bear the burden of demonstrating that the Officers are not so entitled. *Haynes v. City of Circleville,* 474 F.3d 357, 362 (6th Cir. 2007).  The Sixth Circuit recently explained:

> Responding to the many and varied suits brought under § 1983, the judiciary recrafted that limited version of the doctrine of qualified immunity in an effort to protect public officials "from undue interference with their duties and from potentially disabling threats of liability." *Elder v. Holloway*, 510 U.S. 510, 514, 114 S. Ct. 1019,

127 L.Ed.2d 344 (1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982)). We therefore no longer "attempt[ ] to locate [the qualified immunity] standard in the common law as it existed in 1871," *Ziglar v. Abbasi*, —— U.S. ——, 137 S. Ct. 1843, 1871, 198 L.Ed.2d 290 (2017) (Thomas, J., concurring), but instead attempt to determine whether a defendant, by his conduct, "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow*, 457 U.S. at 818, 102 S. Ct. 2727.

*Jackson v. City of Cleveland*, 920 F.3d 340, 368 (6th Cir. 2019).

## A. Wrongful Arrest

The Officers' conduct in arresting Henry is protected by qualified immunity because the Officers did not violate Henry's rights. "In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause. A police officer has probable cause if there is a fair probability that the individual to be arrested has either committed or intends to commit a crime." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (internal quotation and citations omitted). A police officer determines the existence of probable cause by examining the facts and circumstances within his knowledge that are sufficient to inform "a prudent person, or one of reasonable caution," that the suspect "has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995). In *Devenpeck v. Alford*, 543 U.S. 146,

154 (2004), the Supreme Court clarified that the constitutionality of an arrest does not "depend[] on whether the arresting officer states the reason for the detention and, if so, whether he correctly identifies a general class of offense for which probable cause exists." Moreover, precedent "make[s] clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Id.* at 153. "That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause…[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id.*

The Officers had probable cause to arrest Henry for the ordinance violation with which he was later charged, Section 31-12(a)(5), Disorderly Conduct and Disorderly Persons, which states in relevant part:

> (a) A person is a disorderly person if the person does any of the following:
> ….
>
> (5) Persists in disturbing the public peace and quiet by loud or aggressive conduct, having once been clearly informed by persons affected that he is in fact unreasonably causing such a disturbance, provided, however, that notice need not be given when such persons affected reasonably believe that to do so would constitute a risk to their personal safety.

Flint City Code of Ordinances, §31-12(a)(5).

The Officers had probable cause to arrest Henry for the ordinance violation with which he was later charged, Section 31-12, Disorderly Conduct and Disorderly Persons. The Parties do not dispute that Henry was yelling outside in his front yard at 1 a.m., thus satisfying the element of the violation that Henry's conduct could satisfy – "disturbing the public peace and quiet by loud or aggressive conduct." Ord. §31-12(a)(5). Plaintiff Henry indeed admits that that he was "talking with a loud voice" and that his neighborhood is like an "echo-chamber:"

> Q (Defense Attorney Guss): Would you admit yelling and swearing at 1:00 in the morning in a residential area is a disturbance?
> …
>
> A (Henry): I wasn't yelling like that, but, yes, yelling and disturbing like arargh, like that's yelling and disturbing. The way I was, I was talking with a loud voice, which I do all the time as you can see in here, and right by my house is like an echo chamber, okay. If you're ever – You've never been by my house because you stay out here, but it's an echo chamber.
>
> Q: Okay. So your yelling or your loud voice with all the swearing would be like an echo chamber in your residential neighborhood?
>
> A: Yeah.

(Henry Dep., Oct. 10, 2017, ECF #88-8, 88:1-14, PgID 2005.)

The ordinance also requires the violator to be "clearly informed by persons affected that he is in in fact causing such a disturbance…" *Id.* Defendants argue that this element is fulfilled by the Officer Coe telling Henry that he is concerned that

Henry is disturbing the neighbors. Indeed, Coe saw a light turn on at a nearby neighbor's home during the course of the verbal discord.

To reiterate, *see* Section II, Facts, pp. 6-7, *supra*, Officer White had tried time and again to calm down Henry and explain the police concerns about the area where, in the middle of the night, they have been directed by a citizen to look for a felon – an area with quite a few abandoned houses where people had been breaking in. Plaintiff Henry's response was to call an officer "this asshole," and Officer White interjected, saying "hold on, hold on," trying to explain the issue. However, White could not have a conversation with Henry and asked him: "So I'm not going to be able to explain anything to you tonight, sir…?" but Henry still was not willing to de-escalate. To the contrary, Plaintiff Henry responded by calling Officer White an "asshole," Officer Coe a "dumbass," called them both "motherfuckers," and directed them to "get the fuck on!" After, Officer Coe said, "I'm done," in response to Henry asking, "Are you done?" Plaintiff Henry then replied: "Well, get the fuck on then, bitch. Fuck you…and your damn job, motherfucker." *Supra*, pp. 8-9. The Officers' job at that time, that Henry's tirade was interfering with, was to find and arrest the wanted felon that the citizen in their car had stated was in that venue.

Henry continued: "Bring it on…Then you gonna find out who I am!" Officer Coe responded: "Okay, is that a threat?" Henry answered: "Yeah! That's a promise it's a threat! That's a promise it's a threat because I ain't did no crime!" At that point,

the Officers construed Henry's threat speech as a threat to them and their continuing investigation seeking a wanted felon. Although Plaintiff Henry was walking towards his house, he was still yelling at one a.m. in that neighborhood, verbalizing a threat and the Officers did not know whether the highly agitated Plaintiff had firearms in the house: – a highly agitated person retreating into his residence can be reasonably seen as a dangerous situation. (*See* Dep. of Deputy Chief Devon Bernritter, June 21, 2018, ECF #88-10, PgID 2392, 73:14-21.)

Therefore, the Officers had probable cause to arrest Henry for violating Section 31-12(a)(5) ("…disturbing the public peace and quiet by loud or aggressive conduct…), and there was no violation of his constitutional rights, despite any statement that Henry was under arrest for "threatening an officer" and charged with an infraction of Section 31-12 after-the-fact.[5] *See Devenpeck*, 543 U.S. at 154.

## B. Excessive Force

Plaintiffs make several allegations regarding the Officers' use of excessive force in violation of the Fourth Amendment, including the use of OC-spray on Henry, Williams' incidental contact with the OC-spray used on Henry, the failure to

---

[5] The Parties spend much time discussing the content and accuracy of Officer Coe's incident report and all three Officers' Internal Affairs reports. However, according to the undisputed facts and viewing those disputed in the light most favorable to Henry, any inconsistency between these reports and Henry's mobile phone video are inapposite to whether the Officers had probable cause to arrest Henry for violating Section 31-12 and whether excessive force was used.

loosen Henry's handcuffs, and the failure to provide medical care when Henry allegedly had a seizure while being transported.

### 1. Use of OC-Spray

Whether the three Officers violated Henry's right to be free from excessive force is a question that must be analyzed under an "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). This standard requires courts to consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citation omitted).

The general consensus among Sixth Circuit caselaw is that officers cannot use force, including pepper spray, on a detainee who has been subdued, is not told he is under arrest, or is not resisting arrest. *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009). But that was clearly not the case with Henry. There is no genuine issue of material fact that Henry was resisting arrest when Officer Coe made the decision to use the OC-spray. Henry's alleged crime was not severe; he was ultimately charged with disturbing the peace. He was, however, threatening the Officers' and his own safety by struggling to evade Officer Coe, having been told to put his hands behind his back four times in total (Ex. G, Video at 4:38, 5:15; 5:24; 5:28), and attempting to retreat inside his house when Officers Coe and White were making an effort to

arrest him. All three Officers *and* Williams testified that Henry was resisting arrest. (Coe Dep. at 15:19-22; 51:21-25; 55:14-18; 126:20-22; Henige Dep. at 43:14-16; 44:16-20; White Dep. at 101:12-16; Williams Dep., ECF #88-15, 60:23-25, PgID 2469.) Henry's video footage indicates he was resisting arrest. (Defs.' Mot., Ex. G, Henry Video, 4:39-5:20.) It was not until after Officer Coe used the OC-spray that the Officers were able to move Henry off the porch, handcuff him, and place him under arrest.

Moreover, the Officers did not violate Plaintiff Heather William's constitutional rights. There is no allegation that the OC-spray was directed at Williams. Williams testified at her deposition that she was not exposed to much spray, her eyes bothered her "a little" afterwards, and admitted that she was in close proximity to Henry and the Officers yet did not try to move away. (Williams Dep., ECF #88-15, 66:21-25, PgID 2475, 76:1-8, PgID 2485.) This inadvertent spraying of Williams when Officer Coe issued one spray to Henry did not violate Williams' Fourth Amendment rights. *See Wilkins v. City of Royal Oak*, No. 04-cv-73276, 2005 U.S. Dist. Lexis 42474, at *27-28 (E.D. Mich. Aug. 17, 2005) ("Defendants' inadvertent and 'light' pepper-spraying of Tyeesha Emerson while they were pepper-spraying Carvel Wilkins did not violate Tyeesha Emerson's Fourth Amendment rights.").

## 2. Handcuffing Claim

The Officers are entitled to qualified immunity regarding the application of the handcuffs as well. The Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure. *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009). This right was "clearly established" for qualified immunity purposes at the time of Henry's arrest. *Id.* at 401. In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained that the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced "some physical injury" resulting from the handcuffing. *Id.* (citing *Lyons v. City of Xenia*, 417 F.3d 565, 575–76 (6th Cir. 2005)).

Officer White testified that Henry did not complain about the handcuffs in the police vehicle. Officer White did not recall Henry complaining about the handcuffs *until they arrived at the station* – which were then removed – contrary to Plaintiff's characterization of White's testimony. (White Dep., ECF #88-9, 62:14-24, 64:17-25, PgID 2236, 2238; Pls.' Resp., ECF #104, PgID 3548.) *Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir. 2010) ("The District Court properly concluded that Deputy Wagester did not use excessive force in handcuffing Miller because Miller did not complain about the handcuffs until they arrived at the jail, at which point they were removed.").

There was evidence that Henry complained about the handcuffs before he and Officer White departed for the jail, while Officer White was still outside the vehicle taking Henry's information. Henry can be heard on the Dash Video making a statement in the back seat of the car that "the thing is cutting into…my hand." (Def.'s Mot., ECF #88-11, Ex. K, 1:10:13, 1:11:18.) The test is whether an officer's conduct is objectively unreasonable. *Lyons* at 575–76. Even if Officer White heard the "cutting into…my hand" statement from outside the vehicle, it is reasonable that he would not appreciate that this statement would require him to bring another officer over to check the tightness before driving Plaintiff the very short distance to the jail. Officer White was alone in taking the large, resisting Plaintiff to the station: the other two officers were with the cooperating citizen in the back of their car. While Henry testified that there were wounds on his wrists that took three weeks to heal, his claim that he had photos of the alleged wrist injuries was not substantiated: no such photos were included among the exhibits to this Motion, nor have any been produced to Counsel for either Party. (*See* Henry Dep., Oct. 10, 2017, ECF #88-8, 99:15-100:5, 106:18-22, PgID 2016-17, 2023.) While the incident report taken by Officer Bigelow from Plaintiff five days after the arrest stated that Henry indicated a sore left wrist, Officer Bigelow noted only a scrape on Henry's knee, but he did not see any wrist injuries. (Defs.' Mot., ECF #88-18, PgID 2514.)

Therefore, given the single in-car statement about his tight handcuffs, his short trip to the jail, and his failure to include the photos, the Court concludes that Plaintiff Henry's police misconduct-excessive force handcuffing allegation does not survive summary judgment.

### 3. Failure to Provide Medical Care

Henry also claims that he suffered a seizure in the back of the police vehicle while Officer White was transporting him to the jail. Assuming *arguendo* that the Fourth Amendment standard applies, as the Sixth Circuit in *Esch v. Cty. of Kent*, 699 F. App'x 509, 514 (6th Cir. 2017) did, the claim would fail. Officer White testified that he had no knowledge of the alleged seizure at the time. He was the only officer in the vehicle transporting Plaintiff Henry and, as the driver, he was not watching the back of the car, which was dark. Henry did not inform Officer White, the other Officers, or any jail personnel of a seizure or possibility of a seizure before, during, or after the fact. Henry also testified that he was not aware he had a seizure until he subsequently saw the Dash Video footage, so he could not have requested medical assistance from Officer White that White ignored. (Henry Dep., Oct. 10, 2017, ECF #88-8, 136:24-137:16.) It is also worth noting that Henry has never been diagnosed with a seizure disorder, sought treatment for a seizure disorder, or been prescribed anti-seizure medications, before or after the incident at issue. (*Id.*)

Accordingly, the Court finds that there was no violation of Henry's Fourth Amendment rights for failure to provide medical care.

## C. First Amendment Retaliation

Because the Officers had probable cause to arrest Henry for disorderly conduct, there was no violation of his First Amendment rights. Therefore, the Officers are entitled to qualified immunity.

To establish a retaliatory arrest claim, a plaintiff must prove: (1) engagement in protected conduct; (2) an adverse action; and (3) a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct. *Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 217-218 (6th Cir. 2011). Once the plaintiff "raises an inference that the defendant's conduct was motivated in part by plaintiff's protected activity, the burden shifts" to the defendant to show that he "would have taken the same action in the absence of the protected activity." *Id.* at 218-19. Once Plaintiff Henry made "threats," the issue becomes whether the threats were of violence or merely to file a complaint "downtown" of some sort in response to Officer Coe's comment regarding the "special project." However, Henry's continued loud conversation at one a.m., disturbing the neighborhood and interrupting the Officers' investigation, crossed the

line from protected First Amendment speech.[6] This prompted Officer Coe to exit his police vehicle and commence Henry's arrest. Henry had made the "promise" of a threat, and Officer Coe told Henry that was he being arrested for threatening a police officer. On the other hand, a reasonable juror could conclude that Officer Coe's actions were motivated in part by Henry's protected speech, thus establishing the elements of a First Amendment retaliation claim.

However, the Supreme Court in *Reichle v. Howards*, 566 U.S. 658, 665 (2012) made it clear that the Officers remain entitled to qualified immunity because the right to be free from a retaliatory arrest that is otherwise supported by probable cause is not clearly established:

> Howards contends that our cases have "settled" the rule that, "'as a general matter[,] the First Amendment prohibits government officials from subjecting an individual to retaliatory actions'" for his speech. *But we have previously explained that the right allegedly violated must be established*, "'not as a broad general proposition,'" but in a "particularized" sense so that the "contours" of the right are clear to a reasonable official. *Here, the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause. This Court has never held that there is such a right.*

---

[6] *See King v. Ambs*, 519 F.3d 607, 615 (6th Cir. 2008) ("[Plaintiff] repeatedly interfered with an ongoing criminal investigation….[I]t is clear that [plaintiff] was arrested for the act of disrupting the officer's investigation, and not for the content of his speech.").

(internal citations omitted) (emphasis added). *See also Marshall v. City of Farmington Hills*, 693 F. App'x 417, 425-427 (6th Cir. 2017) (affirming qualified immunity from retaliatory arrest claim where right was not clearly established if probable cause existed).

Plaintiffs have provided no argument that *Reichle* does not govern here. All of the authority cited by Plaintiffs pre-date *Reichle*, which clearly contradicts Plaintiffs' argument that the Court must consider the motives of the Officers where probable cause otherwise existed to arrest to Henry in a qualified immunity analysis. Therefore, the Officers are entitled to qualified immunity on Count III because Plaintiffs have not demonstrated that the Officers violated a clearly established constitutional right.

## V.    CONCLUSION

Based on the reasons stated above, the Court GRANTS Defendants Michael Henige, Nikolas White, and Sean Coe's Motion for Summary Judgment.

SO ORDERED.                                        s/Paul D. Borman
                                                   Paul D. Borman
                                                   United States District Court Judge

Date: June 20, 2019